FILED

97 MAY -6 PM 1:32

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GROGAN & ASSOCIATES, INC, )
et al., )
 )
    Plaintiffs, )
 )
v. ) CIVIL ACTION NO. Cho
 )
 ) CV-96-AR-0974-S
SOMMER METALCRAFT CORP, et )
al., )
 )
    Defendants. )

ENTERED

MAY 6 1997

**MEMORANDUM OPINION**

    The court has before it a motion by defendants, Sommer Metalcraft Corporation ("SMC"), Jon Sommer, and Harry Smith,[1] for summary judgement in the above-entitled cause. Plaintiffs, Grogan & Associates, Inc. and George Grogan (collectively "Grogan"), have conceded all of their claims save their Alabama tort claim for intentional interference with contractual or business relations. For the reasons stated below, defendants' motion is well taken and is due to be granted and plaintiffs' action is due to be dismissed.

### A. Pertinent Facts

    George Grogan, both as a part-owner of Flexible Innovations

---

[1] Plaintiffs do not differentiate between SMC and the individual defendants for purposes of their tort claims. Therefore, the court will examine the tort claims against all defendants collectively.

1

21

Inc., ("Flex") and later as the sole-shareholder/employee of Grogan & Associates, Inc., a corporation George Grogan now claims is a sham[2], was an independent sales representative of SMC. SMC is in the business of selling certain specialty products fashioned from wire to its several customers. For a number of years George Grogan sold SMC's products on a commission basis, between 1% and 5% of the sales price. Several writings were fashioned to evidence this arrangement. A common feature of the SMC and Grogan contracts was a clause allowing either party to terminate the arrangement at any time given certain compensation and notice considerations. Another common feature of the agreements is that they were not exclusive. Evidence shows that Grogan was free to sell other products by other manufacturers, even to SMC's customers. Furthermore, the evidence shows that at all bills to SMC customers were issued by SMC and that the monies owed on any sales contracts were payable to SMC. SMC would thereafter pay Grogan or Flex a commission.

During the course of Grogan's relationship with SMC, Grogan received commissions and fostered a relationship with W.C. Bradley

---

[2] It is odd that George Grogan argues that his own corporation is a sham, given the fact that since February 23, 1989, he has represented to both the state of Alabama and the world that Grogan & Associates, Inc. is a legitimate corporation affording him, as sole shareholder, the protection of limited liability against claims by voluntary or involuntary creditors. There is no evidence that the corporation was a sham; therefore, the court will consider George Grogan & Associates, Inc. to be what its name says it is, a corporation.

2

(hereinafter referred to as "W.C. Bradley" or "Char-broil"), a buyer of SMC products--plaintiffs and defendants also refer to W.C. Bradley as "Char-broil". The evidence shows that Grogan sold SMC products to W.C. Bradley and that Grogan sought to find different suppliers for W.C. Bradley. Grogan was unable to do so. There is no evidence of any contractual relationship between Grogan and W.C. Bradley, and there is no evidence that W.C. Bradley was obligated to buy SMC products instead of buying similar products by other manufacturers that existed on the market.

On June 1, 1994, a document was signed by SMC and Grogan evidencing an agreement whereby Grogan would be appointed as an exclusive sales representative for SMC to certain customers listed in an Appendix "A" to that agreement. While "Appendix A" to this agreement is unexecuted, the parties apparently agree that Grogan was to be the exclusive sales representative to Char-broil in Columbus, Georgia and United Chair in Leeds, Alabama. The agreement was to be valid from May 1, 1993, until April 30, 1995. Neither party raises the obvious violation of the statute of frauds inasmuch as the contract was for longer than one year. Thereafter, the agreement could be renewed, but only if both parties executed a new agreement. This contract, which constituted the sole agreement between the parties, superseded all previous contracts or

3

agreements between SMC and Grogan. Grogan's commission rate was to be 5% unless altered by mutual agreement of the parties.

During 1994, SMC's management confronted George Grogan regarding several alleged incidents where George Grogan allegedly verbally abused and/or harassed SMC and W.C. Bradley employees. SMC informed George Grogan that such behavior was unacceptable and that it would affect the possibility of Grogan's contract renewal. While there were renewal negotiations--the exact content of the proposed renewal contract is contested--it is undisputed that the parties did not agree to a new contract. After April 30, 1995, Grogan had no contractual relations with SMC, if it had any before that time.

The facts show that during the period of 1991-96 there was a movement underfoot at SMC to revitalize or rework its distribution and solicitation network. A strategy meeting was held in July, 1991 that proposed a reorganization and new approach to SMC's marketing. On July 13, 1996, a date upon which Grogan most assuredly had no contract with SMC, a handwritten note shows that SMC was planning to re-evaluate its use of existing sales representatives.

In 1995 or 1996, discussions were generated by persons at W.C. Bradley and SMC to bring the W.C. Bradley business "in-house". In

4

other words, SMC would no longer use sales representatives to sell it's products to W.C. Bradley. This eventually occurred, and Grogan no longer has any relationship with W.C. Bradley. From what this court can surmise, Grogan's claim rests on the loss of revenue and loss of business dealings with W.C. Bradley.

### B. Summary Judgment Standard

Rule 56 states, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F. R. Civ. P. 56(c). As stated by the Eleventh Circuit, "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). Defendants have moved for summary judgment.

### C. Legal Analysis

Plaintiffs initially invoked a panoply of claims against defendants including breach of contract, fraud, quantum meruit, fraudulent suppression, and intentional interference with business and contractual relations. Plaintiffs have conceded all of these claims save their claim arising under the tort of intentional

5

interference with business and contractual relations. Defendants' motion for summary judgment on all conceded claims is due to be granted, and plaintiffs' action as to these claims is due to be dismissed. The court will address the only contested remaining claim, namely plaintiffs' claim for intentional interference with business or contractual relations.

> [A] *prima facie* case of intentional interference with business or contractual relations requires poof of the following elements: (1) The existence of a contract or business relation; (2) defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of defendant's interference. However, defendant has the opportunity to prove justification as an affirmative defense to plaintiff's claim.

*Lowder Realty, Inc. v. Odom,* 495 So. 2d 23, 25 (Ala. 1986)(citing *Gross v. Lowder Realty,* 494 So. 2d 590 (Ala. 1986)). Defendants contend that plaintiffs have failed to meet any of these requirements and that even if they did, defendants were justified in their actions.

There is absolutely no evidence that any contract exists between W.C. Bradley and Grogan. All of the evidence shows that Grogan was merely an intermediary between W.C. Bradley and SMC. All sales contracts were solely between W.C. Bradley and SMC. All contracts for commissions paid were solely between SMC and Grogan.

6

Furthermore, it is clear that any contractual obligation, if one ever existed, between SMC and Grogan, that would have required SMC to provide Grogan SMC materials for Grogan to solicit to W.C. Bradley, terminated on April 30, 1995. By conceding the breach of contract claim, Grogan admits as much. Therefore, plaintiffs cannot complain about SMC's failure to re-enter a sales representative agreement with plaintiffs. SMC is free to contract, or not to contract, with any business or individual it wishes. Indeed, even if there were a breach of contract between SMC and Grogan, this alone would not allow Grogan to assert a claim for intentional interference of its business relation.

> The tort of intentional interference with business relations was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties . . . affects the relationship of one of the parties with a third party.

*Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So. 2d 1304, 1306 (Ala. 1990). Furthermore, SMC's refusal to deal with Grogan, which tangentially affected Grogan's relationship with W.C. Bradley, is not actionable as an "interference" with the W.C. Bradley/Grogan relationship. *See Bear Creek Enterprises, Inc. v. Warrior & Gulf Navigation Co., Inc.*, 529 So. 2d 959, 960-61 (Ala.

7

1988).

Therefore, the only thing that plaintiffs can even feasibly complain about is SMC's usurpation of Grogan's solicitation business with W.C. Bradley. Nevertheless, even if SMC's decision to bring W.C Bradley's account in-house "interfered" with the Grogan/W.C. Bradley relationship, said interference was justified.

> "[J]ustification is an affirmative defense to be pleaded and proved by the defendant. Whether the defendant is justified in his [or her] interference is generally a question to be resolved by the trier of fact." *Gross,* 494 So.2d at 597 n.3 (citation omitted)(brackets supplied). The court went on to explain as follows:
>
>> Whether a defendant's interference is justified depends upon a balancing of the importance of the interest interfered with, taking into account the surrounding circumstances. *Restatement (Second) of Torts* § 767 (1979), and Comments. The restatement utilizes the term "improper" to describe actionable conduct by a defendant. Non-justification is synonymous with "improper." If a defendant's interference is unjustified, under the circumstances of the case, it is improper. The converse is also true.
>
> *Id*. While the "absence of justification" generally is a question of fact, courts have ruled on this issue as a matter of law."

*Diefenderfer v. Ford Motor Co.*, 916 F. Supp. 1155, 1160 (M.D. Ala. 1995), *aff'd,* 91 F.3d 163 (11th Cir. 1996)(citing cases) (emphasis added). Defendants have asserted an affirmative defense of

8

justification. Evidence cited by plaintiffs and defendants shows that SMC was attempting to reorganize its sales force to make it more competitive. Plaintiffs offer no evidence or conjecture to show that the elimination of SMC sales representatives and the internalization several SMC accounts was in any way "improper"-- aside from the fact that it hurt Grogan's business. However, mere harm to Grogan is not a strong enough peg upon which to hang a tort of intentional interference with business relations claim. It appears as if Grogan just lost out in the selling market where SMC became a sales competitor. "Competition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in another's business relationship, and is not actionable . . . ." *Dunnivant v. Bi-State Auto Parts,* 851 F.2d 1575, 1584 (11th Cir. 1988) (quoting *Beasley-Bennett Electric Co. v. Gulf Coast Chapter of National Electrical Contractors Assn.,* 134 So. 2d 427, 429 (Ala. 1961)).

Grogan & Associates, Inc., and George Grogan have merely felt the sharp barbs of consolidation and efficiency in a competitive market. The cuts received from such barbs, while painful, cannot create any right for plaintiffs to proceed against defendants without any showing by plaintiffs to rebut defendants'

9

uncontroverted justification argument. Accordingly, defendants' motion for summary judgment is due to be granted and plaintiffs' action is due to be dismissed.

A separate and appropriate order will be entered.

DONE this 6th day of May, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT